ORDERED PUBLISHED

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

| | |
|---|---|
| In re<br><br>ALEKSEY N. KOZLOV,<br><br>Debtor. | Case No. 24-00148-GS<br><br>Chapter 11<br><br><u>Hearing Date</u><br>DATE: January 13, 2026<br>TIME: 9:30 a.m. |

**MEMORANDUM DECISION ON APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROSKAUER ROSE LLP**

Before the court is the *Application for Compensation and Reimbursement of Expenses* (Fee Application) filed by Proskauer Rose LLP (Proskauer), counsel for the unsecured creditors' committee (UCC). Proskauer seeks approval of $636,995.50 in fees, though it has stipulated to limit its administrative claim to $500,000 pursuant to a plan support agreement with the debtor, Aleksey Kozlov. The court previously entered a tentative ruling on the Fee Application and provided the parties-in-interest an opportunity to file written responses prior to a hearing on the Fee Application. Supplemental briefing was provided after the hearing held on January 13, 2026. For the following reasons, the court shall allow Proskauer attorney fees in the amount of $224,106.70 and expenses in the amount of $25,451.04.

**Facts**

**A. The bankruptcy filing and initial activity.**

Mr. Kozlov filed his petition under chapter 11 on August 20, 2024. No committee of unsecured creditors was appointed in this case at that time. His bankruptcy was precipitated by Cathay Bank's efforts to collect on a loan to MFI, Inc., which he and his related companies guaranteed. MFI and the related companies involving Mr. Kozlov filed separate chapter 11

petitions on August 19, 2024. Cathay Bank calculated that as of the petition dates, MFI owed a principal balance of $19,326,374.20. ECF No. 226 at 17-18. That debt was secured against assets primarily held by Salacia, LLC and Whittier Seafood, LLC, two of the companies related to MFI.

In his original Schedule A/B, Mr. Kozlov listed six properties, which he stated were subject to a property status agreement with his non-debtor wife, Irina Kozlova:

1. Raw land parcel no. 950069 in Cle Elum, WA 98922 ("CE Lot 1");
2. Raw land parcel no. 961286 in Cle Elum, WA 98922 ("CE Lot 2");
3. 1322 91st Ave. NE, Bellevue, WA 98004 (the "Bellevue Condo");
4. 7170 N 69th Pl., Paradise Valley, AZ 85253 (the "Arizona Property");
5. 1411 NE Hickory Ln., Issaquah, WA 98027 (the "Hickory Property"); and
6. 4012 129th Pl. SE #2, Bellevue, WA, 98006 (the "Bellevue Residence").

ECF No. 16 at 7-10. Mr. Kozlov valued these properties at slightly more than $19 million. *Id.*

An attachment to the schedules further explained that Mr. Kozlov and Ms. Kozlova were "parties to a Property Status Agreement dated as of June 22, 2023 which establishes that the following properties are the separate property of Ms. Kozlova." *Id*. at 3. Mr. Kozlov also stated that "[b]y listing these properties, most of which are titled in the Debtor's name as well as Ms. Kozlova's name on the Debtor's schedules, the Debtor is not taking the position that they are community property." *Id*. Mr. Kozlov further disclosed that Cathay Bank believed that the property at 5786 Matterhorn Place Northwest, Issaquah, Washington (the "Matterhorn Property") was community property, but he believed it was Ms. Kozlova's separate property because she purchased it with her separate funds. *Id.* at 4.

Originally, Mr. Kozlov listed Cathay Bank as his only known creditor asserting a liquidated debt in his schedules. He stated that Cathay Bank was owed $19,326,374.20 under his personal guaranty at the time of his petition. *Id.* at 24. The deadline to file proofs of claim was set for December 24, 2024. Four creditors ultimately filed claims by the claims bar date. Two professionals employed by Mr. Kozlov prepetition would file additional claims much later. Each of the filed claims is for unsecured, non-priority debts:

| Creditor | Claim No. | Date Claim Filed | | Amount of Claims | Percentage of Total Claims |
|---|---|---|---|---|---|
| JP Morgan Chase Bank, N.A. | 1 | Oct. 29, 2024 | $ | 40,299.30 | 0.19% |
| JP Morgan Chase Bank, N.A. | 2 | Nov. 6, 2024 | $ | 36,873.36 | 0.17% |
| Cathay Bank | 3 | Dec. 19, 2024 | $ | 20,497,257.86 | 95.89% |
| Pacific Premier Bank | 4 | Dec. 20, 2024 | $ | 745,038.30 | 3.49% |
| Peterson Russell Kelly Livengood PLLC | 5 | April 29, 2025 | $ | 15,701.29 | 0.07% |
| CBIZ | 6 | May 7, 2025 | $ | 40,972.50 | 0.19% |
| Total Claims | | | $ | 21,376,142.61 | |

Most of the initial activity took place in the entities' bankruptcy cases jointly administered as *In re Whittier Seafood, Inc.,* Case No. 24-00139, largely because it was generally believed that the business assets would satisfy Mr. Kozlov's unsecured guaranty obligations. In late November 2024, Cathay Bank moved to appoint a trustee in Mr. Kozlov's case. ECF No. 62. A few weeks after that motion was filed, but before the claims bar date ran, Mr. Kozlov filed his original plan of reorganization. ECF No. 74. Mr. Kozlov sought to create two classes of creditors: one class for Cathay Bank and another for all other creditors. At the time Mr. Kozlov filed his initial plan, Cathay Bank was the only creditor to have filed a claim for which payment was due. JP Morgan Chase Bank, N.A. had filed two claims for separate car leases that were current as of the petition date. Mr. Kozlov's plan simply proposed to reaffirm his guaranty to Cathay Bank while proposing to pay the other class in full within two years. By separate motion,

Mr. Kozlov also sought to extend the exclusivity period for him to file and confirm his plan. ECF No. 79.

Pacific Premier Bank filed its proof of claim two days after Mr. Kozlov filed his original plan, on December 20, 2024. Pacific Premier held a guaranty from Mr. Kozlov for another secured debt owed by one of the business debtors jointly administered in *Whittier Seafood*.

The court denied Cathay Bank's motion to appoint a trustee without prejudice on January 19, 2025. ECF No. 83.

**B. The settlement conference and formation of the UCC.**

Around this same time the court scheduled a combined settlement conference in Mr. Kozlov's chapter 11 and the business bankruptcy cases for February 12, 2025. ECF No. 89. The settlement conference was intended to address all matters relevant to the proposal and confirmation of a plan in each of the related cases.

On February 10, 2025, two days before the settlement conference, counsel for Cathay Bank filed a Transfer of Claim Other than for Security on behalf of Cathay Holdings, LLC (Transfer). ECF No. 104. The Transfer disclosed that as of February 7, 2025, Cathay Holdings had acquired the claim of Pacific Premier Bank against Modys, LLC (one of the business debtors) guaranteed by Mr. Kozlov.

David Scheiber signed the agreement by which Cathay Holdings acquired the claim as its vice president. Mr. Scheiber was also the senior vice president and manager of the special assets department for Cathay Bank, and had been serving as Cathay Bank's client representative in Mr. Kozlov's case. *See* ECF No. 63. Counsel for Cathay Bank, James Zack of Ballard Spahr, LLP, also entered an appearance on behalf of Cathay Holdings the same day the transfer of claim was filed. ECF No. 103.

The next day, the day before the scheduled settlement conference, the United States Trustee (UST) filed its Appointment of Unsecured Creditors' Committee (UCC) for Aleksey N. Kozlov. ECF No. 105. The UST's appointment of the UCC noted that Cathay Holdings, represented by David Scheiber, and Cathay Bank, represented by Jonathan David, located at the same address, had expressed their willingness to serve as members of the UCC. ECF No. 105; *see also* ECF No. 177 at 2-3. Based on the absence of a UCC prior to this point, it appears that Pacific Premier was not interested in serving on a committee in furtherance of its guaranty claim.

The parties failed to reach a settlement on February 12, 2025, but the settlement judge continued to negotiate with Mr. Kozlov and Ms. Kozlova after the conclusion of the settlement conference. As a result of these additional negotiations, counsel for Mr. Kozlov delivered a revised term sheet to the settlement judge on February 15, the day Proskauer entered its appearance in the bankruptcy. The revised term sheet proposed that notwithstanding the transfers of real property to Ms. Kozlova, the bankruptcy estate included, subject to community property interests, the six properties listed in the original Schedule A/B: the two Cle Elum lots; the two Bellevue properties; the Arizona Property; and the Hickory Property. ECF No. 168 at 3. It further proposed listing and sale dates, and offered to immediately allow a lien to be placed against the properties in favor of Cathay Bank, except as to the Arizona Property. *Id.* It also provided that Ms. Kozlova would be a party to the contemplated plan agreement and support an amended plan. *Id.* at 4. The revised term sheet did not include the Matterhorn Property as property of the estate, but rather proposed that Cathay Bank would waive any and all claims to that property. *Id.* at 4.

Counsel for Ms. Kozlova provided the revised term sheet to Cathay Bank's counsel on February 18, 2025. ECF Nos. 167 at 2. A continued settlement conference was scheduled for April 22, 2025.

The same day Mr. Kozlov and Ms. Kozlova were delivering the revised term sheet to the settlement judge, Proskauer filed its notice of appearance.[1] ECF No. 112. Proskauer attorney Brian Rosn filed his motion to appear *pro hac vice* as proposed counsel for the UCC. ECF No. 110. Both Mr. Rosen and Proskauer attorney Steven Ma appeared that same day on behalf of the UCC at a hearing on Mr. Kozlov's motion to extend the exclusive period to file and confirm a plan of reorganization. *See* ECF No. 114. The court denied Mr. Kozlov's request to extend the exclusivity filing period but granted his request to extend the exclusive solicitation period to May 17, 2025. ECF No. 115.

On February 18, 2025, on behalf of the UCC, Proskauer filed a limited objection to the first interim fee application filed by Mr. Kozlov's counsel. ECF No. 118. The caption reflected that Mr. Rosen's *pro hac vice* application was pending, and Mr. Ma's was "forthcoming." ECF No. 118 at 1. Mr. Ma's application to appear *pro hac vice* was not filed until a week later, on February 25, 2025. ECF No. 125. Both Mr. Rosen's and Mr. Ma's applications were approved that same day. ECF Nos. 127-28.

On March 4, 2025, Mr. Rosen filed the UCC's proposed chapter 11 plan of reorganization for the debtor but failed to file a disclosure statement. ECF No. 130. At the time the UCC filed its competing plan, the claims bar date had run and the only claims filed against the estate were two vehicle leases that Mr. Kozlov wanted to assume and the two guaranty claims then held by the Cathay entities. The plan proposed separate classes for the claims of Cathay Bank, Cathay Holdings, and unidentified general unsecured claims. The UCC's proposed plan sought to pay Cathay Bank's unsecured guaranty claim to the extent not previously paid by

[1] The proceeding memorandum for the settlement conference does not reflect that Mr. Rosen or Mr. Ma participated in the February 12, 2025, settlement conference. ECF No. 124.

the business entities by transferring to *Cathay Bank* the title to six properties identified in the debtor's revised plan term. ECF No. 130 at 20, Art. IV, ¶ 4.1 ("[C]ommencing on the Sale Deadline, and to the extent that the Cathay Claim has not been satisfied, in full, by the Business Debtors or otherwise prior to the Sale Deadline, *the Liquidating Trustee shall transfer title to the Properties consistent with the schedule set forth on Exhibit "B" hereto to Cathay Bank*….") [emphasis added]. The UCC's plan did not address the Matterhorn Property. As to the unsecured guaranty claim that Cathay Holdings acquired from Pacific Premier, the UCC's plan proposed that if the claim was not paid as part of the business entities' plan, Cathay Holdings' unsecured claim and any other allowed general unsecured creditors were to be paid a pro-rata share of a general unsecured creditors' reserve fund comprised of future payments from Mr. Kozlov but possibly including proceeds from the sale of the two Cle Elum lots. *Id*. at Art. IV, ¶¶ 5.1, 6.1; *see also* Art. I at 16, ¶ 1.78; Art. I at 14, ¶ 1.53 Art. XIII, at ¶ 13.10(a).

The same day the UCC filed its plan, Mr. Rosen filed a motion to authorize the UCC to prosecute the estate's claims for fraudulent transfer of certain properties to Ms. Kozlova. ECF No. 132. The 15-page motion attached a 26-page draft fraudulent transfer complaint seeking authority to pursue an avoidance action against Ms. Kozlova and various holding entities as to the transferred properties. *Id*. The draft complaint sought to recover the two Bellevue properties, the Hickory Property, the Arizona Property and the Matterhorn Property. It did not reference or include the two Cle Elum lots. The motion also included a draft litigation budget suggesting that Proskauer would incur roughly $425,000 to $714,000 to take the case to trial. *Id.* at 41.

The draft complaint differed from the plan the UCC filed that same day in two interesting ways. First, the draft complaint did not include the Cle Elum lots though they were listed as subject to the marital property status agreement disclosed in the original schedules. Whether the

Cle Elum lots were ever transferred prepetition is unclear, but these properties were quickly included as property to be liquidated in furtherance of any plan. Mr. Kozlov amended his Schedule A/B to remove the references to the PSA as to the two Cle Elum lots on March 13, 2025. ECF No. 149 at 4-5. Second, though the draft complaint did seek to recover the Matterhorn Property as a fraudulent transfer, the UCC's original plan did not. Neither the UCC's original plan, nor any amended plan filed by either Mr. Kozlov or the UCC, proposed a recovery and liquidation of that property. Other than the draft complaint, which was never filed, the UCC did not further pursue recovery of the Matterhorn Property.

**C. The application to employ counsel for the UCC.**

Also on March 4, 2025, Proskauer filed its application to be employed as counsel for the UCC (Employment Application). ECF No. 131. Proskauer sought employment under 11 U.S.C. § 328, *nunc pro tunc* to February 13, 2025. The Employment Application revealed billing rates of $1,695 to $2,350 for partners, $1,045 to $1,725 for associates, and $385 to $860 for paralegals. ECF No. 131 at 6. In the Employment Application, Proskauer described its rates as having been "set at a level designed to compensate Proskauer at market levels for the work of its attorneys and paraprofessionals…." *Id.* Proskauer further contended that its rates were "appropriate and the same as…the rates that other comparable counsel would charge to do work substantially similar to the work Proskauer will perform in this chapter 11 case." *Id.* at 7.

The Employment Application drew multiple objections. The UST specifically objected to Proskauer's request to be employed pursuant to § 328(a) and pre-approval of its hourly rates. The UST argued that Proskauer's hourly rates were "substantially higher than the rates of other Counsel involved in the case, and those of other practitioners in the Alaska market." ECF No. 148 at 2:21-22.

Mr. Kozlov and Ms. Kozlova also objected to Proskauer's employment. ECF Nos. 159, 167. Their objections largely mirrored each other. They both joined the UST's arguments regarding Proskauer's employment under § 328(a). Both oppositions also alleged that the formation of the UCC, and the request to hire legal counsel with much higher hourly rates than either the Seattle or Alaska markets, was a tactic designed to thwart the parties' ongoing settlement negotiations and force a more favorable result for secured lender Cathay Bank. Mr. Kozlov's opposition detailed the progress of settlement negotiations. ECF No. 167. The opposition was supported by the declaration of his counsel, which attached a copy of the February 15, 2025, revised term sheet from Mr. Kozlov and Ms. Kozlova. ECF No. 168. The term sheet substantively mirrored the terms of the UCC's proposed plan and amended plan as to the listing and sale of the real properties – except that it excluded the Arizona Property proposed by the debtor.

At roughly this same time, Mr. Kozlov also moved to dissolve the UCC. ECF No. 164. Mr. Kozlov argued that "there was no legitimate separateness between the two creditors in this case." *Id.* at 4.

On March 25, 2025, Mr. Kozlov filed his Second Amended Plan of Reorganization. ECF No. 162. Consistent with the revised term sheet provided in February 2025, the new plan committed to sell five of the six properties at issue, though it continued to exclude the Arizona Property. The plan committed to list two properties immediately and the remaining three properties within six months of the effective date of the plan. Mr. Kozlov's second amended plan also proposed to assume the two vehicle leases, disclosing that no cure payments would be required.

In its reply to the objections to its employment, filed on March 28, 2025, Proskauer disagreed that its rates were inappropriate and argued that its "appearance on behalf of the Committee helped promote the nascent agreement reached in connection with the Business Debtors' chapter 11 cases. Although the Debtor and Kozlova may disagree, it has even prompted the Debtor to face reality and realize that creditors are entitled to be heard and their rights addressed in the Debtor's chapter 11 case." ECF No. 170 at 2. Nevertheless, Proskauer agreed to "allow the Court to determine the reasonableness of Proskauer's fees upon the conclusion of the Debtor's chapter 11 case." *Id.* at 4.

The court heard oral argument on the Employment Application on March 31, 2025. During the hearing, the court stated its concerns regarding Proskauer's employment, chiefly, the cost-benefit analysis of its UCC representation in light of the hourly rates charged by Proskauer when compared to Alaska and Seattle counsel. ECF No. 171 at 18:00-19:58. Specifically, the court stated that it was unlikely to approve the "high-end rates" proposed by Proskauer, or the involvement of multiple Proskauer attorneys. *Id.* at 21:30-51; 35:37-46. The court further made clear that any fee application would be reviewed with a "fine-toothed comb." *Id.* at 22:05-11. Additionally, the court directed Mr. Rosen and Mr. Kozlov's counsel to disclose their fees in Mr. Kozlov's monthly operating reports (MOR). *Id.* at 22:11-38. Mr. Rosen responded that he was satisfied with the court setting the rates it found appropriate. *Id.* at 24:56-25:05.

Following oral argument, the court set an in-person evidentiary hearing on the Employment Application and the motion to dissolve the UCC for April 23, 2025. ECF No. 172.

On April 16, 2025, Ms. Kozlova filed her objection to the UCC's motion for standing to sue on the fraudulent transfer claims. Ms. Kozlova argued that the creation of the UCC and retention of Proskauer was not only inappropriate but unnecessary:

> This case does not present an "appropriate situation" that requires granting the Committee the authority to spend $400,000 to $700,000 to seek relief that Ms. Kozlova has already been willing to essentially grant, subject to certain guideposts. Where the Debtor has refused to bring suit or relief is otherwise not available, *then* derivative standing should be considered. [citation omitted] That has not been the situation here. As the Debtor's plan indicates, Ms. Kozlova has been in discussions about allowing the sale of certain real properties purchased during the Kozlovs [sic] marriage. She just wants them sold on a reasonable timeline, with reasonable marketing, and after the Whittier business cases have had a chance to determine if the claims of the Committee's two creditors can be paid in full from the sale of the business assets which are their primary collateral. There is no need to spend hundreds of thousands of dollars in litigation over the same issue. Nor did the Committee even try to determine whether the Standing Motion, much less the litigation, was necessary before filing the Standing Motion.

ECF No. 184 at 5 [emphasis in original].

Mr. Kozlov then filed a reply in support of his motion to dissolve the UCC on April 18, 2025. He again emphasized his ongoing involvement in the settlement negotiations that began prior to the creation of the UCC. ECF No. 186 at 2.

**D. Continued settlement negotiations lead to a confirmed plan.**

In light of the parties' ongoing settlement efforts, the court vacated the evidentiary hearings pending the outcome of the continued settlement conference with the Hon. Trish Brown to be held in person in Seattle on April 22, 2025. ECF No. 188 ("The court has been advised that the parties continue to make progress on settlement discussions, and the settlement judge has requested that the parties be permitted to continue their discussions ahead of the previously scheduled matters currently set for in person hearings on April 23, 2025."). The court was informed that no settlement was reached during the April 22, 2025, settlement conference, but the parties again were continuing to negotiate with the assistance of Judge Brown.

On April 29, 2025, the UST supplemented its objection to the Employment Application. The UST stated that Proskauer had not complied with the court's directive from the March 31, 2025, hearing to provide its fees for inclusion in Mr. Kozlov's March 2025 MOR. ECF No. 198.

The UST further alleged that although it set a deadline for Proskauer to report the law firm's monthly fees as a separate supplement to the March 2025 MOR, the law firm had neither responded to the email, nor complied. For this reason, the UST also objected to Proskauer's employment pursuant to § 1103 for non-compliance with the court's directive. *Id.* at 2.

Also on April 29, 2025, Peterson Russell Kelly Livengood PLLC filed a late proof of claim for $15,701.29 for prepetition legal services provided to Mr. Kozlov. Roughly a week later, CBIZ filed its late proof of claim in the amount of $40,972.50 for "CPA services performed" prepetition with no billing records or other documents to support its claim.

Proskauer filed its reply to the UST's supplement on its Employment Application on April 30, 2025. ECF No. 200. It stated that upon review of its fees incurred in February and March 2025 it realized that reductions were appropriate, and those adjustments could not be accomplished in time for the filing of Mr. Kozlov's March 2025 MOR. Instead, Proskauer decided to disclose its fee amount, $280,964.29, solely to Judge Brown. Proskauer committed to providing the information for the forthcoming April 2025 MOR, and assured the court that it "endeavored to considerably reduce its fees and expenses in its representation of the Committee." *Id.* at 3.

On May 5, 2025, the court entered its order setting a status conference in Mr. Kozlov's case for May 9, 2025. ECF No. 202. In response, Mr. Kozlov filed a case status report, which revealed that the parties had reached a comprehensive settlement in all the related cases. As part of that settlement, the parties in Mr. Kozlov's bankruptcy entered into the "Plan Support Agreement with Respect to, Among Other Matters, the Chapter 11 Case of Aleksey N. Kozlov" (PSA). ECF No. 204. The PSA provided that no later than May 9, 2025, Mr. Kozlov and Ms. Kozlova would withdraw their objections to the Employment Application. ECF No. 204 at 9, ¶

54. In accordance with the PSA, Mr. Kozlov and Ms. Kozlova timely withdrew their objections to the Employment Application. ECF Nos. 205-06. Further, under the PSA Mr. Kozlov and Ms. Kozlova agreed not to oppose Proskauer's fee application, which the parties agreed would not exceed $500,000. *Id.* at 6, ¶ III.

At the May 9, 2025, status conference, Mr. Rosen reported that the PSA included a cap on the law firm's fees and requested that the court approve the Employment Application. ECF No. 210 at 11:22-38. The UST reiterated its opposition to the request for employment under § 328, and reserved the right to object to Proskauer's fees upon the filing of its fee application(s). *Id.* at 11:46-12:14. The court directed the parties to lodge a stipulated order approving Proskauer's employment. *Id.* at 12:16-27. At the conclusion of the hearing, the court reminded the parties that it would address the issue of Proskauer's hourly rates at the conclusion of Mr. Kozlov's case. *Id.* at 17:17-24.

The court approved the PSA on May 20, 2025. ECF No. 218.

Proskauer filed a second amended plan (Second Amended Plan) on behalf of the UCC on May 28, 2025, together with a disclosure statement. ECF Nos. 225-26. The UCC's Second Amended Plan provided for the sale of the five properties originally proposed by Mr. Kozlov and Ms. Kozlova for payment of the estate's creditors but now included the sale of the Arizona Property for the first time – though the Arizona Property would be listed and sold last. The UCC's Second Amended Plan also provided at Section 2.2 that: "notwithstanding anything contained herein to the contrary, provided that the Creditors' Committee's professional requested fees and expenses are in an aggregate amount equal to or less than Five Hundred Thousand Dollars ($500,000), such fees and expenses shall be paid in full, in Cash." *Id.* at 19.

On May 29, 2025, the court entered its order addressing the Employment Application. ECF No. 229. The court noted that the proposed order lodged by Proskauer on May 22, 2025, was not stipulated to by any of the parties. Moreover, the law firm's proposed order continued to provide for the law firm's employment under § 328 contrary to the UST's objection and the court's direction. *Id.* at 1. The court set a deadline of June 4, 2025, for Proskauer to either file a statement explaining why a stipulated order approving the Employment Application had not been lodged, or alternatively, lodging a proposed order which bore the signatures of counsel for the opposing parties. *Id.* at 2. On June 3, 2025, Proskauer lodged an order with the signatures of the UST and other counsel agreeing as to the form of the order consistent with the court's prior comments. The UST then withdrew its objections to the Employment Application. ECF No. 236. Accordingly, on June 5, 2025, the court entered the stipulated order approving the Employment Application, specifically noting that such employment was approved under § 327, not § 328, and that the court would determine the reasonableness and allowance of Proskauer's fees and expenses. ECF No. 238.

The court approved the disclosure statement on a final basis and confirmed the UCC's Second Amended Plan on July 18, 2025. ECF No. 271.

**E. Proskauer's Fee Application.**

On September 18, 2025, Proskauer filed its application for compensation and reimbursement of expenses. ECF No. 293. In it, Proskauer seeks approval of $636,995.50 in fees and reimbursement of $25,451.04 in expenses for services rendered from February 13, 2025, to August 4, 2025. In accordance with the PSA and the confirmed Second Amended Plan,

Proskauer has limited its requested total payment to $500,000.[2] Having expended a total of 392.8 hours over approximately six months, the blended hourly rate for all of Proskauer's professionals including paralegals is $1,621.68. However, exclusive of the 88.8 hours of paralegal fees billed, which is discussed in greater detail below, the 304 hours billed by attorneys resulted in a blended hourly attorney rate of $2,095.28. In the Fee Application, Proskauer asserts the blended hourly rate, divided by the 392.8 total hours billed, is $1,272.91 based on the reduced $500,000 compensation request. ECF No. 293 at 2:8-10.

On September 30, 2025, the UST filed its objection to the Fee Application and requested that the court reduce the requested fees by $125,185.[3] ECF No. 296. The UST objected to several categories of fees billed, including fees for pro hac vice applications and Proskauer's retention in the amount of $41,454; excessive partner communications at .1 hours totaling $34,075; multiple attorney billing at $10,689; and clerical and mailing preparation fees in the amount of $25,970. *Id.* at 6. The UST also addressed excessive or unnecessary expenses incurred, such as charges for color copying, mailings, and proofreading.

Proskauer did not file a reply to the UST's objection to the Fee Application. Instead, on October 16, 2025, it lodged a proposed order with the court, stating in its email that both the UST and counsel for Mr. Kozlov had approved the language in the proposed order, which bore the electronic signature of the UST's counsel. The proposed order reduced Proskauer's Fee Application by $109,188 in fees and $13,017.10 in costs, and proposed to allow $524,807.50 in fees and $12,443.94 in expenses. Because these proposed amounts still exceeded the negotiated

[2] Confusingly, in the Fee Application Proskauer asserts that no objection to its employment was interposed by Mr. Kozlov or the UST. *Id.* at 3:17-18. That assertion is incorrect.

[3] On October 7, 2025, Mr. Kozlov filed his limited response to the Fee Application, requesting inclusion of certain language addressing payment of any funds remaining in Stoel Rives' trust account after payment of Stoel Rives' and Proskauer's respective fee applications. ECF No. 297.

cap on fees, Proskauer again agreed to limit payment of its Fee Application to $500,000. The proposed order also included the language requested by Mr. Kozlov's counsel in his limited objection to the Fee Application.

On December 1, 2025, the court entered its Order Setting Hearing on Application for Compensation and Reimbursement of Expenses of Proskauer Rose LLP. ECF No. 301. As part of that order, the court provided a tentative ruling on the law firm's Fee Application. The tentative ruling proposed to limit Proskauer's applicable hourly rates to those charged by Seattle counsel in Mr. Kozlov's and the related business bankruptcy cases. The court further detailed its concerns regarding the reasonableness of the hours billed in light of the limited nature of the representation. The tentative decision concluded that Proskauer's attorney fees should be reduced to an allowed amount of fees and expenses in the total amount of $191,374.50. The court set a hearing on the Fee Application and provided interested parties the opportunity to file written responses to the tentative decision before the hearing. Proskauer, Cathay Bank, and Cathay Holdings filed responses to the court's tentative ruling. ECF Nos. 309-10; 312.

At the hearing, the court advised Proskauer that the law firm had failed to produce required evidence of the applicable hourly billing rates in the relevant community. As the matter was unopposed, the court nonetheless provided Proskauer, Cathay Bank, and Cathay Holdings the opportunity to supplement the record on that issue. The parties did so and the court then took the matter under submission.

**Discussion**

The bankruptcy court has an independent duty to review fee applications even where there are no pending objections. *Lobel & Opera v. United States Tr. (In re Auto Parts Club)*, 211 B.R. 29, 33 (B.A.P. 9th Cir. 1997) (citing *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833,

841 (3d Cir. 1994)). Bankruptcy courts are statutorily required to review the reasonableness of fees even where the parties reach a consensual resolution of their fee objections. *See, e.g., In re Recycling Indus., Inc.*, 243 B.R. 396, 400-402 (Bankr. D. Colo. 2000) (reviewing fees incurred by UCC counsel after consensual resolution of the U.S. Trustee's objection). As explained in *In re Sann*, 2016 WL 7852311, at *8 (Bankr. D. Mont. Dec. 15, 2016) (quoting *Busy Beaver*, 19 F.3d at 841), "'[t]he integrity of the bankruptcy system is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte*.'" (citation modified). Proskauer has billed $662,446.54 in fees and expenses in less than six months. The law firm seeks approval of these fees and expenses, but consistent with the terms of the PSA, it seeks payment of $500,000 for its services in representing the UCC.

The Cathay creditors support Proskauer's Fee Application as submitted. It is likely that the attorney fees sought will not reduce the Cathay creditors' ultimate recovery on their unsecured claims in this case. Given their projected recoveries from the entities' bankruptcy and the individual bankruptcy case, the UCC's disclosure statement estimated the Cathay creditors would recover "[u]p to 100%." ECF No. 226 at 12. Nothing has been suggested to the contrary in the Cathay creditors' briefing.[4] Rather, the payment of the requested fees will ultimately be borne by Mr. Kozlov. While he has agreed not to object to Proskauer's reduced fees, he did so after the court made clear that it would carefully examine the hours billed and the applicable hourly rates.

The court was clear abouts its concerns regarding employment of national counsel and the rates it sought to charge in this case. The creation of the UCC and retention of Proskauer

[4] At a recent hearing in the case, counsel for Mr. Kozlov confirmed that the collateral securing Mody's obligation to Pacific Premier, now owed to Cathay Holdings, was sold and paid the claim held by Cathay Holdings in full. ECF No. 349 at 9:08-22.

came well after the parties had proceeded with the case and were about to embark on settlement negotiations. Mr. Kozlov's case was clearly tied to the business bankruptcy cases and the hope that liquidation of those assets would fully satisfy Cathay Bank's guaranty (and the separate guaranty acquired by Cathay Holdings). But the business cases were not generating income, necessitating a quick resolution. This also required Mr. Kozlov to quickly resolve his individual bankruptcy as well. The context of these cases, and the court's involvement in them, plays a significant part of its assessment of the reasonableness of Proskauer's fees. Though the opposition to the Fee Application was resolved, it never addressed the applicable hourly rate. The court expressly reserved this question in granting Proskauer's application for employment. And that question remains outstanding. As detailed in the tentative decision and the UST's objection to the Fee Application, there are also other issues concerning the reasonableness of the hours billed. The subsequent briefing has not alleviated the court's concerns, which it now addresses.

**A. Standards for review of compensation to professionals of the chapter 11 estate.**

The legal standards for compensation of an estate's professionals are well established. Compensation of professionals employed under § 327(a) is governed by § 330(a). A court may award professionals "reasonable compensation for actual, necessary services rendered by the … attorney and by any paraprofessional person employed by any such person; and … reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Bankruptcy courts are required to examine fee applications to ensure that the fees and expenses sought are reasonable, and may award less than the amount requested. 11 U.S.C. § 330(a)(2). Specifically, the court is not to allow fees for "unnecessary duplication of services" or services that were not reasonably

likely to benefit the debtor or necessary to the administration of the estate. 11 U.S.C. § 330(a)(4)(A).

The reasonable value of services rendered by a debtor's attorney is a question of fact to be determined by the bankruptcy court. *See, e.g., Am. L. Ctr. PC v. Stanley (In re Jastrem)*, 253 F.3d 438, 443 (9th Cir. 2001). But the burden is always upon the applicant to demonstrate that the fees requested are reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *In re Gilsvik*¸ 2025 WL 3205574, *5 (B.A.P. 9th Cir. Nov. 17, 2025). Supporting evidence may include proof "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

To determine the reasonable amount of compensation, the Code requires the court to "consider the nature, the extent, and the value" of the professional's services. Section 330(a)(3) enumerates the following non-exclusive factors courts should take into account to evaluate the reasonableness of fees:

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

Discussing the means by which bankruptcy courts evaluate and assess the reasonableness of fees, the Bankruptcy Appellate Panel for the Ninth Circuit (BAP) has explained:

> [T]he bankruptcy court has the benefit of two distinct but equally valid perspectives concerning the reasonableness of the fees requested: first, the bankruptcy court observes, in an immediate, particularized, and firsthand basis, the delivery of services in connection with particular matters or hearings, and can thus assess the difficulty of the tasks presented and other factors that should dictate the likely time and skill necessary to produce the services, as well as the quality of the services; second, the bankruptcy court has the added perspective of presiding over the matter in a cumulative sense, and is therefore also uniquely able to assess the overall reasonableness of fees measured by the entirety of the aggregate task. Both perspectives are valid, and the bankruptcy court may employ either, or both, in any given instance.

*Phillips v. Gilman (In re Gilman),* 2019 WL 3074607, at *4 (B.A.P. 9th Cir. July 12, 2019), *aff'd*, 836 Fed. Appx. 511 (9th Cir. Nov. 25, 2020).

When applying either of the two perspectives discussed in *Gilman,* bankruptcy courts typically begin with the lodestar method to assess the reasonableness of fees in bankruptcy. *Law Offices of David A. Boone v. Derham–Burk (In re Eliapo),* 468 F.3d 592, 598 (9th Cir. 2006). Under the lodestar method, "'the number of hours reasonably expended' is multiplied by 'a reasonable hourly rate' for the person providing the services." *Id.* (quoting *Hensley*, 461 U.S. at 433). Though courts may depart from the lodestar method where necessary, "[t]here is a 'strong presumption' that the lodestar figure represents a reasonable fee." *Sunset Coast Holdings, LLC v. Hughes Investment P'ship, LLC (In re Tower Park Props., LLC)*, 2021 WL 755771, at *4 (B.A.P. 9th Cir. Feb. 26, 2021) (quoting *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1262 (9th Cir. 1987)). Here, the lodestar method is the proper starting point for assessing the reasonableness of Proskauer's fee application under § 330(a)(1), which raises questions concerning both the hourly rate and the time billed.

**B. Proskauer's hourly rates.**

Proskauer billed its attorneys at hourly rates ranging from $1,045 to $2,350. Paralegals at the firm charged between $320 and $640 per hour. Proskauer's Fee Application reflects the following hours billed by its professionals for representation of the UCC:

| **Attorney** | | **Hourly Rate** | **Hours Billed** | **Fees Billed** | **Blended Rate** |
|---|---|---|---|---|---|
| Brian Rosen | Partner | $2,350.00 | 173.8 | $408,430.00 | |
| Steve Ma | Associate | $1,690.00 | 53.1 | $89,739.00 | |
| William Walsh | Associate | $1,605.00 | 32.2 | $51,681.00 | |
| George LePage | Associate | $1,045.00 | 44.7 | $46,951.50 | |
| George LePage | Associate | $1,200.00 | 0.2 | $46,951.50 | |
| Total Attorney Billings | | | 304 | $643,753.00 | **$2,117.61** |
| | | | | | |
| **Paralegal** | | | | | |
| Ella Gaspar | Paralegal | $485.00 | 45.2 | $21,922.00 | |
| Nolan Hafer | Paralegal | $320.00 | 25.2 | $8,064.00 | |
| Emma Lotts | Paralegal | $320.00 | 2.9 | $928.00 | |
| Nicole Oloumi | Paralegal | $640.00 | 13.5 | $8,640.00 | |
| Jennifer Yakubov | Paralegal | $320.00 | 2 | $640.00 | |
| Total Paralegal Billings | | | 88.8 | $40,194.00 | **$452.64** |
| | | | | | |
| **Total Fees Billed** | | | **392.80** | **$683,947.00** | **$1,741.21** |

**1. The record before the court does not support retention of a national firm charging national rates in this instance.**

Proskauer readily concedes that its rates exceed those charged by local counsel for the applicable local community. In support of the hourly rates charged, Proskauer argues that it is a national law firm entitled to charge national rates consistent with the rates billed in this case. It states that its rates are reasonable because they are "generally comparable to those of other firms of a similar size with comparable bankruptcy practices and similar expertise that have a national presence." ECF No. 293 at 13. The underlying premise of the argument is well grounded. Bankruptcy is a specialty area, and many chapter 11 cases raise complex issues involving debtors

engaged in national and international business. In recognition of this, bankruptcy estates regularly retain national law firms for employment in national cases. Bankruptcy courts have authorized rates above the prevailing local market rates "if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *In re Millenkamp Cattle, Inc.,* 2026 WL 1147290, at *3 (Bankr. D. Idaho Apr. 27, 2026) (citing *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997)). In such instances it is necessary to approve rates exceeding the prevailing local rates to attract representation by a law firm that has "expertise across multiple practice areas to effectively manage the complexities of the case, which is often not readily available at local rates in the local market." *In re Retail Group, Inc.*, 2022 WL 9722306, at *11 (Bankr. E.D. Va. Sept. 16, 2022). To support such a departure from the prevailing local rates, however, courts "must assess whether a requested rate is justified based upon the facts and circumstances of the case." *Id.* As part of this assessment "courts will also consider whether 'the work done by counsel is atypically complex, efficient, or precocious for the relevant local market.'" *Id*. (quoting *In re Am. Freight Sys., Inc.*, 1997 WL 309123, at *8 (D. Kan. May 6, 1997)).

In *In re Kennewick Public Hospital District*, 2018 WL 5799258 (Bankr. E.D. Wash. Oct. 19, 2018), the Hon. Frederick Corbit confronted a similar issue when considering Arent Fox LLP's fee application as counsel for the unsecured creditors' committee. Arent Fox argued that the bankruptcy was "nationwide in scope and uniquely complex" because the case was "a chapter 9 bankruptcy, and in addition, involved municipal finance, healthcare regulatory, transactional, corporate trust, litigation and other complex legal matters." *Id.* at *7. As the bankruptcy court explained:

> [W]hen determining a reasonable fee the court must consider "local sensibilities and the economics of the local bar" as well as the "economics of out-of-state counsel and the customary fee in other jurisdictions." In a complex case compensation based on a professional's customary billing rate, though exceeding the prevailing local rate, may be justified due to the professional's expertise. However, if a local professional with the required expertise could have been retained, a professional from another jurisdiction may be "reasonably compensated" even though the allowed fee is based on a rate lower than his customary charge.

*Kennewick Public Hosp. Dist.*, 2018 WL 5799258 at *2 (citing *In re Southern Industrial Banking Corporation*, 41 B.R. 606, 612–13 (Bankr. E.D. Tenn. 1984) [citations omitted]). The court noted that Arent Fox had not identified with particularity what exactly was uniquely complex or required special services from a national law firm. Rather, the court found that most of the time billed had been spent on litigation involving Washington real estate and trust law, while the second-most time involved the disclosure statement and objections to the plan. The court reduced the fee application in large part because it concluded that much of the work could have been performed by local counsel charging local rates. *Id.* at 7.

**a. The record fails to show that there were no qualified counsel in the local community available to represent the UCC.**

This case is remarkably similar to *Kennewick Public Hospital District.* Proskauer contends that it is entitled to charge national rates significantly in excess of the prevailing local rates. The court disagrees. As in *Kennewick Public Hospital District,* Proskauer has failed to identify what was so complex or special about Mr. Kozlov's case that national counsel was required. Instead, it and the Cathay creditors argue that they were "generally aware" that there were "limited options" in Alaska and Seattle for representation because all the experienced and qualified local bankruptcy attorneys were already employed or conflicted in the bankruptcy cases. ECF No. 310 at 3. However, no specifics have been presented to support such a finding other than the Cathay creditors' conclusion that other Seattle counsel were already participating

in the business cases. Despite this, the plan administrator later retained K&L Gates LLP in Seattle, which has a chapter 11 practice.[5] And no mention is made of any bankruptcy counsel in Portland, Oregon. This is notable as Proskauer and the Cathay creditors define the local market as the Pacific Northwest for purposes of their supplemental briefing. Moreover, as Proskauer has also noted, Whittier Seafood employed Portland-based Sussman Shank, LLP as debtors' counsel in the business bankruptcy cases after it terminated Bush Kornfeld.

In short, there is no reliable evidence that competent local bankruptcy counsel was not available in the relevant market.

**b. This case did not involve any unique, complex, or national issues.**

Nor was there anything about *this* case that was so unique or unusual that it required national expertise. The only claims were undisputed, unsecured debts that were predominantly based on Mr. Kozlov's personal guaranty of the business debts. There has been no challenge to any claim. True, Mr. Kozlov conveyed his real estate assets to his wife shortly before the bankruptcy filing as disclosed at the inception of the bankruptcy. These conveyances, which Proskauer described as "flagrant,"[6] were plainly and openly subject to well understood claims of fraudulent transfer to a nondebtor spouse shortly before the bankruptcy filing without consideration. Again, there is no evidence or argument that the prospective fraudulent transfer claims presented any complex or unique issues that could not be handled by local Alaska counsel, much less required national counsel.

Initially, the primary obstacle to reorganization was Mr. Kozlov's intransigence to realistically addressing his personal obligations. Indeed, Proskauer recognized as much in its

[5] *See In re Ideal Property Invest. LLC,* Case No. 24-01421 (Bankr. E.D. Wash.) (K&L Gates represented the unsecured creditors' committee).
[6] ECF No. 312 at 2.

briefing on its Employment Application. But a debtor's intransigence in chapter 11 is neither unique, nor complex. Toward this end, the parties in both Mr. Kozlov's bankruptcy and the business bankruptcy cases were addressing the situation prior to the creation of the UCC through settlement negotiations with the assistance of an experienced bankruptcy judge who has successfully conducted numerous settlement negotiations. The parties advised the court that they were making progress towards a global resolution of all matters that would result in the consensual confirmation of plans for liquidation of both the business entities' and Mr. Kozlov's assets. The February 2025 revised term sheet and subsequent proposed plans demonstrate the progress that was being made.

Filings from Mr. Kozlov and Ms. Kozlova show that by the time the UCC was created and retained Proskauer they had already agreed to commit all the properties sought by the UCC but the Arizona Property to pay the claims of the estate – which in reality appears to have been Cathay Bank. The revised term sheet provided to Cathay Bank in February 2025 also provided a timeline for the listing, placement of liens, and sale of the properties. ECF No. 184 at 2-3; *see also* ECF No. 162. From the court's perspective, it appears that the structure of a settlement arose essentially at the same time the UCC was created and Proskauer retained to represent it. The court's review of the evolution of the revised term sheet, competing plans, the PSA, and ultimately the confirmed plan show that by February 2025, all parties agreed that the two Cle Elum lots, the two Bellevue properties and the Hickory Property would be liquidated and a schedule would be needed for the listing, placement of liens, and sale of those properties. It further appears that by March 4, 2025, when the UCC filed its original plan, that the parties agreed that the UCC would not pursue the Matterhorn Property. While the specific dates for the scheduled actions has necessarily changed since then, the overall settlement structure has not.

From these events the court finds that by the time Proskauer appeared as counsel for the UCC, the only remaining dispute to be resolved was whether and when Mr. Kozlov and Ms. Kozlova would commit to liquidate the Arizona Property. While confirmation of a plan was also necessary, it was increasingly apparent that resolution of the fraudulent transfer claims would most likely result in a consensual plan.

Ultimately, the agreement reached by the parties with the assistance of the settlement judge simply added the Arizona Property to the other properties previously committed to pay the estate's claims. But the parties also agreed that the Arizona Property would be the last property to be listed and sold – if needed to pay Cathay Bank in full after liquidation in the business bankruptcy cases. Consistent with the previous settlement offer and Mr. Kozlov's second amended plan, the settlement also locked in dates for the listing and sale of the properties, though the dates were roughly a month earlier than those Mr. Kozlov and his wife proposed to the settlement judge on February 15, 2025.[7] *Compare*, ECF Nos. 162 at 25 and 168 at 5; ECF No. 218 at 10. The agreement, memorialized in the PSA, was unopposed and led to confirmation of the consensual plan.

Proskauer contends this occurred because it was retained. Based on its involvement in both the business bankruptcy cases and this case, the court believes that settlement was merely a matter of time even before the UCC was formed. It remains an open question, however, whether the UCC and Proskauer's representation advanced or impeded that resolution given the revised

---

[7] The confirmed plan incorporated and recognized the provisions of the PSA that provided Cathay Bank with liens against the real property conveyed to Ms. Kozlova. ECF No. 241-1 at 7. It is unclear to the court why the UCC struck a deal to grant Cathay Bank a secured claim in the recovered properties to the exclusion of the other nominal unsecured creditors of the estate.

term sheet sent to the settlement judge on February 15, 2025. What is abundantly clear is that this case did not involve any unique or complex matters that required national expertise.

**c. The dominant purpose of the UCC was to increase pressure on the debtor.**

Based on the court's experience in both Mr. Kozlov's case as well as the business bankruptcy cases, it is left with the firm conviction that Cathay Bank used Cathay Holdings to purchase Pacific Premier's debt solely to prompt creation of a creditors' committee that could hire counsel to place additional financial pressure upon the debtor. Cathay Holdings had no involvement in either Mr. Kozlov's bankruptcy or that of the business bankruptcy cases prior to the purchase of Pacific Premier's debt. Moreover, Pacific Premier's debt was understood to be oversecured by the borrower's real property. Though Pacific Premier held an unsecured guaranty claim against Mr. Kozlov, the debt was owed by one of the business debtors, Modys, LLC. The underlying debt was secured by a deed of trust against real property in Bellevue, Washington. *See* Case No. 24-00142, Proof of Claim No. 2-1 and ECF No. 1, pp. 13; 15. Pacific Premier filed its claim in the amount of $745,038.50. Mody's originally valued the property securing the debt at $4,000,000. Pacific Premier valued its collateral at $2,800,000. *Id.* In the absence of any discussion of Pacific Premier's debt, the court concludes that it was significantly oversecured, which may well explain why that creditor was never involved in Mr. Kozlov's bankruptcy prior to Cathay Holdings' purchase of the debt. The oversecured nature of the debt strongly suggests that Cathay Holdings' interest and active involvement in Mr. Kozlov's bankruptcy was not driven by any concern of repayment, but rather in furtherance of Cathay Bank's interests and the creation of the UCC.

Cathay Bank argues that it was concerned that Mr. Kozlov would gerrymander creditor classes for confirmation of an unacceptable plan. Mr. Scheiber states in his declaration in support

of Proskauer's fee application that Cathay Holdings began its efforts to purchase Pacific Premier's claim in December 2024 as a response to Pacific Premier's claim and Mr. Kozlov's original plan. ECF No. 310 at 2. But it is unclear how Mr. Kozlov was attempting to gerrymander classes for confirmation at that time, or why it feared such a plan would be confirmed, presumably over its objection. At the time that Cathay Holdings purchased the debt, there were only four claims filed against the estate: the two guarantees and the two current vehicle leases that Kozlov would assume with no outstanding cure obligation. When Cathay Holdings began its efforts to acquire Pacific Premier's debt, Pacific Premier's guaranty claim was effectively the only other outstanding debt to be addressed in the plan.

However, in support of Cathay Bank's "gerrymandering" argument, it relies on a comment from a March 26, 2025, hearing, made well after the purchase of Pacific Premier's claim, the formation of the UCC, Proskauer's retention, and the exchange of the revised term sheet agreeing to the liquidation of properties to pay Cathay Bank's debt. Two much smaller unsecured claims were later filed well after the claims bar date and after counsel's comment noted by Cathay Bank. Neither prepetition debt was disclosed in the schedules Mr. Kozlov filed, and these debts were owed to professionals he employed. These late filed claims ostensibly can be viewed to support Cathay Bank's stated concern that the debtor would attempt to manipulate the creditor classes for confirmation of a plan, though the likelihood of the success of such efforts is questionable. But these claims were filed in late April and early May 2025, well after there was agreement to liquidate five of six properties and shortly before the PSA was signed and filed with the court on May 9, 2025. Given the timing of these late claims, the court gives very little credit to Cathay Bank's argument that it needed Cathay Holdings to purchase Pacific Premier's debt to protect Cathay Bank.

Cathay Bank always dominated the unsecured class. Its debt comprised 95.89% of the total unsecured claims. With the purchase of Pacific Premier's unsecured guaranty claim, the combined Cathay creditors jumped to 99.37% of the unsecured class even after the two late filed claims. Both Cathay creditors were represented by experienced bankruptcy counsel. It is questionable why they agreed to form a creditors' committee, much less retain national counsel given that the UCC effectively represented only the Cathay creditors' interests, particularly where they were adequately represented by their own counsel. Rather, the purchase of Pacific Premier's debt, the creation of the UCC, and retention of a national law firm were part of a concerted effort by Cathay Bank to pressure the debtor into an agreement that favored its interests in the face of accruing administrative expenses. That message was unmistakenly delivered when the UCC filed its motion for derivative standing laying out a projected litigation budget of roughly $400,000 to $700,000.

That said, two unsecured creditors existed and were willing to serve on an unsecured creditors' committee. Though there was a pending motion to dissolve the UCC, the parties resolved the question of the Arizona Property before that motion was submitted for decision. Based on the record before it, and as recognized by the UST, there is no issue with the formation of the UCC. But it remains unclear to the court why counsel from Seattle, Portland, or Alaska could not have represented the UCC. For the reasons explained above, the court has rejected the argument that there were no qualified counsel available within the Pacific Northwest and finds this argument not to be credible. Rather, Cathay Bank involved Cathay Holdings to prompt creation of the UCC and retain Proskauer in an attempt to make representation of the UCC as costly as possible.

To be clear, the court has considerable respect for Proskauer's expertise and bankruptcy skills. Undoubtedly, it is a well-known national law firm fully capable of handling national bankruptcy cases. In the appropriate case involving complex or unique issues requiring national counsel, this court would have no problem allowing Proskauer's fees to represent either a chapter 11 debtor or creditors' committee on such matters in Alaska. Yet, this was clearly not such a case. As the Third Circuit Court of Appeals has stated in reviewing fees outside of bankruptcy, "[a] Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). That is exactly what has happened here. The Cathay creditors retained counsel charging national rates far in excess of prevailing local rates to handle fraudulent transfer claims, which were effectively reduced to a lone fraudulent transfer claim by the time of their retention. And that is exactly what it did. Yet, the terms of the final settlement and confirmed plan appear to largely mirror the terms set forth in Mr. Kozlov's and Ms. Kozlova's revised term sheet provided to Judge Brown as a result of the original settlement negotiation.

For all these reasons, the court concludes that Proskauer has failed to carry its burden to warrant charging national rates far above the prevailing rates in the local community.

**2. The applicable local community and prevailing market rates in this case.**

Reasonable hourly rates are determined according to "the prevailing market rates in the relevant community." *Sam K. ex rel Diane C. v. Haw. Dep't of Educ.*, 788 F.3d 1033, 1041 (9th Cir. 2015) (quoting *Van Skike v. Dir., Office of Workers' Comp. Programs*, 557 F.3d 1041, 1046 (9th Cir. 2009)); *The Bankruptcy Law Firm, PC v. Siegel (In re Morry Waksberg M.D., Inc.),* 2015 WL 9437343, at *5 (B.A.P. 9th Cir. Dec. 22, 2015), *aff'd in part, rev'd in part and remanded,* 692 Fed. Appx. 840 (9th Cir. 2017). "Generally, when determining a reasonable

hourly rate, the relevant community is the forum in which the … court sits." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013) (quotation omitted). Courts may then consider "the experience, skill, and reputation of the attorney" within the relevant community to determine the prevailing market rate "for attorneys and paralegals of similar 'experience, skill, and reputation' to members of [the fee applicant's] legal team working on similarly complex matters." *Id.* at 1205-06 (quotation omitted). "The fee applicant has the burden to produce evidence of the prevailing market rates, but the court may consider fees awarded by others in the same locality for similar cases and may rely on its 'own knowledge of customary rates and [its] experience concerning reasonable and proper fees.'" *Tower Park*, 2021 WL 755771, at *5 (quoting *Sam K.*, 788 F.3d at 1041); *In re Robinson*, 2025 WL 1570995, at *1 (Bankr. D. Hawai'i June 2, 2025) (bankruptcy court may rely on its knowledge of local prevailing rates to establish the appropriate hourly rate for a lodestar calculation).

Obviously, this is an Alaska bankruptcy and Alaska is the relevant community. However, the state of the local bankruptcy practice has been in flux for some time now. Currently, there are a limited number of attorneys in Alaska that practice in chapter 11 that could represent an unsecured creditors' committee. That is not to say there are none. The Alaska counsel with the requisite experience to represent a chapter 11 debtor in possession or committee have charged between $395-$475 per hour.[8] In short, experienced local bankruptcy counsel in Alaska bill under $500 per hour.

[8] *See In re Yak Timber*, Case No. 23-00080 ($475 per hour for debtor's counsel); *In re YC Rivergold*, Case No. 23-00072 ($475 per hour for debtor's counsel); *In re Alaska Urological,* Case No. 20-00086 ($475 per hour for debtor's counsel); *In re Tester Drilling*, Case No. 20-00282 ($395 per hour for debtor's counsel).

However, Mr. Kozlov, the business entities, the UCC for *Whittier Seafood*, and Cathay Bank were each represented by Seattle counsel from the Western District of Washington. Mr. Kozlov retained John Kaplan with Stoel Rives in Seattle, Washington consistent with the trend. Mr. Kaplan charged $725 per hour at the beginning of the bankruptcy case and increased his fees to $750 per hour in 2025. His associate billed at $565 per hour, and the firm's paralegal billed at $370 per hour.[9] *See* ECF No. 290 at 4.

Bush Kornfeld, debtors' counsel in the business bankruptcy cases jointly administered in *Whittier Seafood,* has appeared in Alaska bankruptcy cases since 2017.[10] Bush Kornfeld charged $350 per hour in 2019 to serve as counsel to the debtor in *In re Hearts and Hands of Care, Inc.*, though the application to employ noted that other attorneys in the firm billed at a maximum rate of $540 per hour at that time.[11] Bush Kornfeld has continued to represent debtors and the chapter 7 trustee in the District of Alaska at rates ranging from $375 to $695 per hour.[12] During their representation of the debtors in *Whittier Seafood,* Bush Kornfeld billed at $425 per hour for associates and between $595 to $695 per hour for partners.

---

[9] The court notes that the associate billed a total of 1.3 hours on the case. ECF No. 290 at 4. It is unclear, therefore, how representative this billing rate may be.

[10] *See In re Hook Line & Sinker, Inc.,* Case No. 17-00415 (representing creditor/party in interest); *In re Alaska Dispatch News, LLC*, Case No. 17-00285, ECF No. 136 (chapter 7 trustee on contingency fee).

[11] *In re Hearts and Hands of Care, Inc.,* Case No. 19-00230, ECF No. 80-1 at 2; 331 at 3 (highest billing rate at $425 per hour, though most of the work was billed at $350 per hour or less).

[12] *In re Body Renew Alaska, LLC,* Case No. 20-00075 (chapter 11 debtor); *In re RB Enterprises LLC,* Case No. 21-00040 (chapter 11 debtor); *In re Weber, Inc.,* Case No. 22-00122 (debtor in involuntary chapter 7); *In re Miss Brenda, LLC,* Case No. 23-00041 (subchapter V debtor's counsel); *In re Sea West, Inc.,* Case No. 23-00042 (subchapter V debtor's counsel); *In re Wards Cove Packing Co., Inc.,* Case No. 23-00163 (subchapter V debtor's counsel); *In re Top Notch Holdings, Inc.,* Case No. 23-00164 (subchapter V debtor's counsel).

David Neu with Miller Nash LLP in Seattle represented the unsecured creditors' committee for Whittier Seafood in the jointly administered entities' bankruptcy cases. Miller Nash billed between $390-$410 for associates and $690-$750 per hour for partners during its representation.

Even counsel for the UST was located in Seattle and has been appearing from Seattle since 2013.

Washington-based Neeleman Law Group has also represented chapter 11 debtors in Alaska.[13] Consistent with the rates billed by Seattle counsel in this case and the business bankruptcy, they have billed between $475 to $600 per hour to represent debtors within chapter 11 in Alaska.

As this case demonstrates, the local bankruptcy community for the District of Alaska has been evolving as experienced local chapter 11 practitioners have left the practice. Currently counsel from Washington regularly appear in chapter 11 cases filed in Alaska. As a result, the prevailing hourly rates for chapter 11 work in Alaska in appropriate cases now include those set by Washington counsels' representation of the debtors and unsecured creditors' committees in cases such as the *Whittier Seafood* and *Kozlov* cases. This was certainly an appropriate case, and the court has uniformly approved Seattle counsel's rates, which range between $595-$750 for partners and $390-$565 per hour for associates.

As noted by Mr. Kozlov's original objection to Proskauer's hourly rates, the law firm's hourly rates are significantly in excess of those hourly rates being charged for similar bankruptcy

[13] *In re Frozen Horizon Alaska, LLC,* Case No. 24-00155 (chapter 11 debtor's counsel, billing at $550 per hour); *In re Miss Brenda, LLC*, Case No. 25-00036 (counsel for subchapter V debtor, billing between $475 to $600 per hour); *In re Sea West, Inc.,* Case No. 25-00037 (counsel for subchapter V debtor, billing between $475 to $600 per hour).

representation in Alaska, even by Seattle law firms that have appeared in Alaska cases. Brian Rosen was the only partner for Proskauer to bill fees in the *Kozlov* representation. Mr. Rosen billed at $2,350 per hour, which is $1,600 more per hour than the highest rate for Seattle counsel in the *Kozlov* and *Whittier Seafood* cases. Proskauer's lowest associate billing rate was $1,045 per hour, or $480 per hour more than the highest Seattle associate. Two thirds of the time billed by Proskauer's paralegals were billed at the rates charged by *associates* in Seattle or higher.[14]

In its tentative decision, the court proposed to limit Proskauer's applicable hourly rate to $750 per hour for partners and $565 per hour for associates to match that charged by Seattle counsel involved in both this case and the business bankruptcy cases. In response, Proskauer has supplemented its briefing to compare the fees previously discussed above with those of other firms that have been employed in other cases within the Eastern and Western Districts of Washington. Proskauer stated that it reviewed fee applications in complex chapter 11 cases in the Pacific Northwest to assess the prevailing hourly rates. Based on the following fees, ranked from highest partner hourly rate down, Proskauer argues that the prevailing partner rates significantly exceeded the $750 per hour charged by Seattle counsel in this case (including that charged by Cathay Bank's and Cathay Holdings' counsel):

| Debtor | Case No. | District | Law Firm | Role | Partner Rate | Assoc. Rate |
|---|---|---|---|---|---|---|
| Easterday Ranches, Inc. | 21-00141 | Bankr. E.D. Wash | Pachulski Stang Ziehl & Jones LLP | Debtors | $1,775.00 | $ 825.00 |
| iCap Enterprises, Inc. | 23-01243 | Bankr. E.D. Wash | O'Melveny Myers LLP | Debtors | $1,585.00 | $1,070.00 |
| Easterday Ranches, Inc. | 21-00141 | Bankr. E.D. Wash | Cooley LLP | Ranches Committee | $1,351.50 | $ 947.75 |
| PNW Healthcare Holdings, LLC | 19-43754 | Bankr. W.D. Wash | Foley & Lardner LLP | Debtors | $1,120.00 | $ 596.17 |

[14] Ella Gaspa billed 45.2 hours at $485 per hour while Nicole Oloumi billed 13.5 hours at $640 per hour. ECF No. 293 at 7.

| | | | | | | |
|---|---|---|---|---|---|---|
| iCap Enterprises, Inc. | 23-01243 | Bankr. E.D. Wash | Buchalter | Debtors | $ 975.00 | $ 450.00 |
| Easterday Ranches, Inc. | 21-00141 | Bankr. E.D. Wash | Davis Wright Tremaine | Debtors-Special Counsel | $ 970.00 | $ 580.00 |
| PNW Healthcare Holdings, LLC | 19-43754 | Bankr. W.D. Wash | Troutman Pepper Hamilton LLP | UCC | $ 935.00 | $ 525.00 |
| University Place Rehabilitation, LLC | 20-42793 | Bankr. W.D. Wash | Troutman Pepper Hamilton | UCC | $ 895.00 | $ 500.00 |
| Refreshing USA, LLC | 24-01863 | Bankr. W.D. Wash | Force Ten Partners | Debtor | $ 890.00 | $ 550.00 |

First, and perhaps foremost, Mr. Kozlov's bankruptcy was not as complex as any of the referenced Washington cases, as discussed in the next section.[15] This is in marked contrast to the *Easterday* and *iCap* bankruptcy cases referenced above that involved significantly more complicated and numerous matters.[16]

Second, the high end of the rates charged in these cases were from counsel based *outside* the Pacific Northwest. Thus, it appears that partners at the national firms using lawyers outside of Seattle – Pachulski Stang Ziehl & Jones LLP, O'Melveny & Myers LLP, Cooley LLP, and Foley & Lardner LLP - billed in excess of $1,000 per hour. On the other hand, those firms using

[15] *See, e.g., In re Retail Grp., Inc.*, 2022 WL 9722306, at *13–14 (Bankr. E.D. Va. Sept. 16, 2022), *report and recommendation adopted as modified sub nom. Patterson v. Mahwah Bergen Retail Grp., Inc.*, 2022 WL 4287200 (E.D. Va. Sept. 16, 2022) (determining Pachulski Stang's above-market attorney rates reasonable in light of the "size and complexity" of the case, including resolution of "complex issues" which benefitted "thousands of creditors.").

[16] The *Easterday* case was a jointly administered chapter 11 business case involving large-scale cattle and feedlot operations, as well as over 18,000 acres of active farmland. The debtors' total combined liabilities exceeded $240 million. Commenced in February 2021, after a number of sale motions, settlements, and claim objections among other motion practice, the debtors' third amended plan of liquidation was confirmed in July 2022. Seven adversary proceedings were commenced and nearly 300 proofs of claim were filed. Filed in the fall of 2023, the *iCap* bankruptcy was also a jointly administered chapter 11 proceeding involving the cases of 25 related entities engaged in real estate development and investment. Among other issues, the case addressed allegations of an extensive Ponzi scheme operated by the debtors' founder. In the *iCap* bankruptcy case, nearly sixty fraudulent transfer adversary proceedings were filed. The *iCap* debtors' second-amended plan of liquidation was ultimately confirmed in October 2024. As of the date of this decision, both cases remain open for ongoing administration.

partners in Seattle – Buchalter, Davis Wright Tremaine, Troutman Pepper Hamilton LLP, and Force Ten Partners – billed under $1,000 per hour. A similar dichotomy exists with the hourly rates for associates, with Seattle associates billing roughly what Stoel Rives was billing for its associate – between $480-580.

The court's understanding of the limited, run-of-the mill bankruptcy issues addressed in this case strongly supports application of hourly rates equivalent to the Seattle counsel involved in this case and the related business cases.[17] Yet, Proskauer argues for higher rates without demonstrating the expertise that was required or brought to bear that would ordinarily support higher hourly rates. On the other hand, Mr. Kozlov waived the right to contest this issue. Indeed, it was his intransigence, not only in this bankruptcy (by originally proposing a plan that merely reaffirmed his guaranty) but also in the business cases, that resulted in this situation. Based on the supplemental billing information provided, the court finds that the high end of the prevailing local hourly rates for chapter 11 services in the Eastern and Western Districts of Washington for the relevant time period was $1,000 per hour for partners and $565 per hour for associates.[18] As there is no opposition to application of the highest hourly rate in the applicable legal community,

[17] Not the least of this is Proskauer's failure to provide any evidentiary support for its hourly rate as the applicable rate in the community prior to supplemental briefing.

[18] Proskauer suggests that the court should examine twelve factors set forth in *Johnson v. GA Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) in determining the final lodestar amount. ECF No. 293 at 12. The Ninth Circuit Court of Appeals has held that "it is well established a court has discretion to adjust the lodestar upward or downward" based on factors enumerated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992); *Whitaker v. SMB Group*, 2023 WL 5842311, at *1 (9th Cir. Sept. 11, 2023). The court has exercised its discretion not to further adjust the lodestar calculation based on those factors.

the court will apply $1,000 per hour for partners and $565 per hour for associates for Proskauer's billings.[19]

The court stated in its tentative decision that it would limit Proskauer's hourly rate for paralegals to $370 per hour to mirror the highest paralegal rates charged in the bankruptcy cases for Mr. Kozlov and the business entities. No response to this hourly rate was provided. Therefore, the court will limit the paralegal hourly rate to $370 per hour.

**C. The reasonableness of the time billed.**

As stated above, in addition to consideration of the rates charged by an applicant, courts must also determine whether the hours billed were reasonable. To evaluate the hours billed, courts consider: "(A) the time spent on such services;… (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; …. and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(a)(3). In doing so, bankruptcy courts should "examine the circumstances and the manner in which services are performed and the results achieved in order to arrive at a determination of a reasonable fee allowance." *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet)*, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000). Bankruptcy professionals, in seeking compensation for their services, "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise

[19] The court further notes that the billing rates for Proskauer's associates ranged considerably. In light of the absence of any current objection, the court will simply apply the same hourly rate for each of the associates though ordinarily some of that time should be billed at lower hourly rates.

unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434. In *Mednet* the Bankruptcy Appellate Panel further explained that "in making this determination, the court must take into consideration whether the professional exercised reasonable billing judgment." *Id.* at 109. This is because "[h]ours that are excessive in relation to the task accomplished are not reasonable and should be excluded from fee applications. In deciding whether time spent is excessive, the court must consider factors such as the skill and experience level of the practitioner, as well as the complexity, importance and nature of the task at hand." *In re Mohsen*, 473 B.R. 779, 792 (Bankr. N.D. Cal. 2012) [internal citations omitted].

Proskauer billed 392.8 hours for $636,995.50 in fees. In its fee application, it broke down the fees into 106.9 hours for $71,993.00 on case administration and 285.9 hours for $565,002.50 on plan and confirmation issues. However, the billing statements supporting the Fee Application fail to break down the time entries into any category.[20] Rather, the billing statements simply present the entries in a chronological order with a summary by timekeeper. The statements further omit any calculation of the fees earned under each entry; only the time spent is recorded. This has frustrated the court's ability to assess the reasonableness of the hours billed. Based on

---

[20] The fee application fails to comply with Alaska's Local Bankruptcy Rules (LBR) 2016-1(a) and (c)(5), which requires that professionals seeking compensation in this District must categorize their billings into identifiable projects and comply with the UST's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Guidelines). Among other things, the Guidelines provide that "all time and service entries should be arranged by project categories," with time entries "to be reported in chronological order under the appropriate project category." *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330*, at ¶¶ (b)(4)(i) and (iv).[20] Based on its review of the billing statements it appears that the law firm spent time on the following categories: (1) case administration; (2) employment and the related issue of dissolution of the UCC; (3) fraudulent transfer claims; (4) plan confirmation; and (5) sale issues.

the court's experience in this case, as well as the closely related business bankruptcy cases, the court is left with a firm and distinct conviction that the hours billed were excessive in total, and excessive for case administration and plan/confirmation issues as well.

**1. Paralegal time is predominantly noncompensable overhead.**

The paralegal time is particularly problematic. The overwhelming amount of the paralegal time appears to be administrative or clerical in nature. In its Order Setting Hearing on Application for Compensation and Reimbursement of Expenses of Proskauer Rose LLP, the court detailed 61 entries of paralegal billings that it deemed administrative or clerical, much of which overlaps with the UST objection.[21] ECF No. 301 at 24-25. The court incorporates by reference the identification of specific billing entries deemed administrative and clerical in the tentative decision. In total, Proskauer billed 88.8 hours of paralegal time for $40,194 in paralegal fees before any adjustment of the applicable hourly rates. ECF No. 293-1 at 22. These entries and fees reflect time billed for pulling pleadings, filing documents, monitoring the docket, preparing shipping and distribution labels, creating binders, and maintaining the docket calendar.

Paralegals provide essential legal services efficiently and economically in many cases. However, the mere fact that a task is done by a paralegal, or an attorney, does not automatically render that time compensable under § 330. Rather, the time billed by a paralegal must involve "some independent judgment or are matters that an attorney would be expected to perform but can, under an attorney's supervision, be performed by an individual with specialized training or experience." *In re Salazar*, 2005 WL 3190581, at *3 (Bankr. S.D. Fla. Sept. 16, 2005) (citing *In*

---

[21] The UST objected to the Fee Application and sought reduction of fees for clerical services and mailing preparation. The UST's detail of the challenged billings entries for these two categories reflects that the time was billed by paralegals. ECF Nos. 296-6 and 296-7. The UST's objection to the clerical fees and mailing preparation overlaps the court's identification of administrative and clerical fees.

*re Valley Historic Ltd. P'ship,* 307 B.R. 508, 517 (Bankr. E.D. Va. 2003)). As such, bankruptcy courts have long held that clerical or secretarial services are not compensable from the bankruptcy estate. *In re Holthoff,* 55 B.R. 36, 42-43 (Bankr. E.D. Ark. 1985) (fee request for ministerial tasks including file organization not allowed); *In re Global International Airways Corp.,* 38 B.R. 440, 444 (Bankr. W.D. Mo. 1984) (secretarial services disallowed).

As the bankruptcy court in *In re CF & I Fabricators of Utah, Inc.,* 131 B.R. 474, 489 (Bankr. D. Utah 1991) explained:

> If the services provided by the paraprofessional represent a shift of tasks ordinarily performed by a lawyer or other professional, and the service is reasonable and necessary, the service is compensable. If clerical or secretarial services shift to the paraprofessional, the service is overhead and not a reasonable charge to the estate.

The *CF & I Fabricators* court further observed: "If the service performed by a paraprofessional consists of typing, data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying, or mailing documents, the task is clerical in nature and not compensable." *Id.* at 492. This has been repeatedly established under § 330. *See In re Nelson,* 2017 WL 449581, at *3 (Bankr. E.D. Wis. Feb. 1, 2017) ("[T]asks performed by paralegals may be compensated separately only if the tasks are more substantive than clerical work; work that is clerical or secretarial in nature, regardless of who performs it, should be treated as an overhead expense and not separately recoverable."); *In re Parrilla*, 530 B.R. 1, 23 (Bankr. D.P.R. 2015) ("[R]eceiving and reviewing certificates of service and notices of appearance, identifying and uploading documents to the [t]rustee, checking the docket, mailing letters, organizing files, and updating files are tasks that do not constitute substantive legal work."); *In re Guzman*, 2009 WL 607401, at *1 (Bankr. D.N.M. Mar. 5, 2009) ("Tasks that are purely secretarial or clerical in nature are not compensable from the bankruptcy estate and are

considered part of office overhead."); *In re Stewart*, 2008 WL 8462960, at *7 (B.A.P. 9th Cir. Mar. 14, 2008) (quoting *In re Dimas*, 357 B.R. 563, 577 (Bankr. N.D. Cal. 2006)) ("Clerical work is not compensable as it is 'not in the nature of professional services and must be absorbed by the applicant's firm as an overhead expense.'"); *In re Schneider*, 2007 WL 2688812, at *4 (Bankr. N.D. Cal. Sept. 13, 2007) ("Although services that require a paralegal's judgment, analysis, or education may be compensable…other related tasks such as downloading, printing, and indexing clearly are clerical and are not compensable. Certainly, organizing property files by county would not require any independent judgment and is not compensable.").

The vast bulk of the paralegal billings relate to filings, maintaining and monitoring dockets, preparing documents for service, and pulling or retrieving documents. These tasks do not require the exercise of independent professional judgment but rather comprise clerical services that are not compensable under § 330. The court shall disallow 84.8 hours of paralegal billings as previously identified in the tentative decision (ECF No. 301 at 24-25) in the original amount of $38,254. The court has allowed the remaining 4.0 paralegal hours at the applicable community rate of $370 per hour.

**2. A percentage reduction in attorney hours is appropriate.**

Setting aside the paralegal time discussed above, the Fee Application includes 304 hours in attorney time. Again, the Fee Application fails to break this time into applicable categories to aid the assessment of the reasonableness of the hours billed. In its objection and supporting exhibits, the UST detailed the specific hours and fees warranting a reduction in the amount of $125,185.10, calculated based on Proskauer's original hourly rates. Pertinent to the review of the attorney hours billed, the UST objected to the following hours and fees by category (exclusive of

objections to clerical fees and mailing preparation, which were addressed in the above discussion of paralegal fees):

| | | |
|---|---|---|
| Retention and Pro Hac Fees | 23.4 | $41,454.00 |
| Partner's 0.1 Internal Communications | 14.5 | $34,075.00 |
| Multiple Attorney Fees | 8.1 | $10,689.00 |
| Total | 136.1 | $103,200.00 |

The UST's objection was never argued to the court. Instead, Proskauer submitted a proposed order reflecting consensual resolution of the UST's objections. The proposed order reduced the requested fees by $109,188, but because the fees remaining still exceeded Proskauer's negotiated $500,000 compensation cap, the reduction was never allocated.

The court shares the concerns raised by the UST that Proskauer's attorney fees are excessive. The tentative decision discussed similar concerns and proposed specific reductions totaling 23.6 hours for $14,943.50. Additionally, the court raised its concerns that Proskauer excessively billed hours in light of Mr. Kozlov's and Ms. Kozlova's willingness to liquidate five of the six properties at issue at the time the law firm was retained. As discussed above, at roughly the same time the UCC was created and Proskauer retained, the Arizona Property was apparently the only remaining issue precluding an agreement between the parties – which, in reality, were Mr. Kozlov and Ms. Kozlova on the one hand and Cathay Bank on the other. Instead, Proskauer aggressively spent time to posture fraudulent transfer claims as to all six properties. While some time was certainly understandable and appropriate, the court cannot accurately determine the total time actually spent.

The billing statements further raise concern why it was necessary to spend the time to complete and file the reply on the motion for derivative standing on April 23, 2025, when it appears that the parties were already finalizing the PSA which was executed and filed with the court just over two weeks later on May 8, 2025. ECF Nos. 193-94; 204.

The court also questioned Proskauer's insistence that it draft the plan and disclosure statement *after* executing the PSA. It was Mr. Rosen, charging $2,350 per hour, who was primarily involved with the drafting of the plan, disclosure statement, and who took the lead in the confirmation proceedings, especially after the parties executed the PSA, which effectively set the terms for the consensual plan. At that point, efforts should have been made to limit the fees required to document that agreement and obtain confirmation where there was no opposition. *See generally Smith v. United States Trustee (In re Rivera),* 2023 WL 8776750, at *8 (B.A.P. 9th Cir. Dec. 19, 2023), *aff'd Smith v. United States Tr., Phoenix,* 2024 WL 4589808 (9th Cir. Oct. 28, 2024) (quoting *Auto Parts Club,* 211 B.R. at 33) ("Beyond the literal language that the services must be reasonable and necessary to be compensable, '[p]rofessionals have an obligation to exercise billing judgment.'"). In this instance, there were other capable professionals to draft the plan, disclosure statement and take the lead for confirmation. The situation might be different if there were truly an active class of multiple unsecured creditors to benefit under the plan. Instead, this was a two-party dispute, and counsel for Cathay Bank or the debtor's counsel were more than capable of handling the confirmation of a consensual plan for the liquidation of a handful of properties.

Finally, there is a relatively small amount of time billed primarily in June and July 2025, totaling roughly 10 hours, for monitoring sales of assets in both the business bankruptcy cases and Mr. Kozlov's cases. Having negotiated the PSA and proposed an unopposed plan, it is unclear what benefit was to be gained for the UCC in monitoring sales of assets. This is particularly true as to the sales within the business bankruptcy cases that served to benefit Cathay Bank as the primary creditor in those bankruptcy cases. Though the sales obviously affected the

amount of Cathay Bank's claim in Mr. Kozlov's case, the court fails to see any benefit to the unsecured creditor class from monitoring the sales in the business bankruptcy cases.

The concerns raised by the UST in its objection and those raised by the court demonstrate that some reduction in hours is appropriate. The UST sought to reduce 46 hours of attorney time for $86,218 at the original billing rates. This included $41,454 in attorney time identified by the UST billed on Proskauer's employment and pro hac vice admission in Alaska. According to the UST's objection, Proskauer billed 23 attorney hours on these matters, which, when reduced to the applicable locality hourly rate, totaled $15,005.00. The court does not agree that all time related to employment of the law firm should be disallowed, though some adjustment appears appropriate for Mr. Rosen's numerous .1 billings and the multiple attorneys involved (Mr. Rosen and three associates).

More importantly, given its involvement in both the business bankruptcy cases and this case, the court believes that on the whole some reduction is necessary to account for its concerns that excessive and unnecessary hours were billed on the matters raised by the UST as well as the court's concerns relating to the pursuit of the fraudulent transfers, plan/confirmation issues, and monitoring the sales of property as discussed above. Again, the calculation of this reduction is exacerbated by Proskauer's failure to adequately break down the time billed in its Fee Application.

Bankruptcy courts often reduce hours billed in fee applications on a percentage basis "as a practical means of trimming fat from a fee application.'" *In re Coxeter*, 2012 WL 7070198, at *9 (Bankr. E.D. Cal. Nov. 6, 2012) (quoting *McDonald ex rel Prendergast v. Pension Plan of the NYSA–ILA Pension Trust Fund,* 450 F.3d 91, 97 (2d Cir. 2006)); *In re PG&E Corp.*, 2021 WL 666333, at *5 (Bankr. N.D. Cal. Feb. 17, 2021). A percentage reduction of hours represents a

pragmatic means to achieve rough justice when the record "impedes a court's ability to determine the reasonableness of the hours spent on individual tasks …." *In re Vandevco Ltd.*, 2024 WL 3886781, at *7 (Bankr. W.D. Wash. Aug. 20, 2024). In determining whether and what percentage fee reductions may be appropriate, "the bankruptcy court's superior knowledge of the underlying case and the litigants entitles it to a great deal of deference." *Gilman*, 2019 WL 3074607 at *17.

The court concludes and finds that a reduction of 10% of the billed attorney hours is appropriate. This reduction adequately addresses the court's concerns over excessive hours billed while accounting for the posture of the case and the parties' efforts to settle the UST's objections. The court will reduce 10% of both the partner and associate hours, which equates to 17.38 partner hours and 13.02 associate hours, for a total reduction of 30.4 hours. This results in a total reduction of attorney hours billed in the amount of $24,736.30. This result incorporates the specific objections to hours raised in the UST objection – with the exception of the fees related to Proskauer's employment – but also accounts for the court's own concerns as to unreasonable or excessive hours related to employment of the law firm, the fraudulent transfer issues, plan and confirmation issues, and the post-confirmation monitoring of real property sales.

**Conclusion**

For the reasons stated above, the court finds that (1) the applicable hourly rates used in the Fee Application must be adjusted to reflect those charged within the applicable legal community, and (2) the hours billed must also be reduced to account for excessive hours and fees. The court shall allow total fees in the amount of $224,106.70, calculated as follows:

| Timekeeper | Hourly Rate | Hours Billed | Total Fees |
|---|---|---|---|
| Partner | $1,000.00 | 173.8 | $173,800.00 |
| Associate | $565.00 | 130.2 | $73,563.00 |
| Paralegal | $370.00 | 88.8 | $32,856.00 |
| | Less 10% Partner Hours | (17.38) | ($17,380.00) |
| | Less 10% Associate Hours | (13.02) | ($7,356.30) |
| | Less Administrative Hours | (84.8) | ($31,376.00) |
| | **TOTAL ALLOWANCE** | **277.6** | **$224,106.70** |

Proskauer's expenses are allowed in the full amount of $25,451.04.

The court shall enter a separate order consistent with this memorandum.

Dated: September 1, 2026

By: /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve: Debtor
J. Kaplan, Esq.
J. Torgerson, Esq.
T. Brannon, Esq.
G. Fox, Esq.
A. Ivanov, Esq.
J. Zack, Esq.
M. Parise, Esq.
L. Thornton, Esq.
B. Rosen, Esq.
W. Walsh, Esq.
L. Stoddard, Esq.
J. Salmon, Esq.
A. Paranjpye, Esq.
B. Peterson, Esq.
C. Myerson, Esq.
U.S. Trustee
ECF Participants via NEF